UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**WOLVERINE PROCTOR & SCHWARTZ, LLC,**      Chapter 7
    Debtor                                                                 Case No. 06-10815-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

### I. INTRODUCTION

The matters before the Court are the Trustee's Motion to Approve Settlement Agreement Regarding Pension Benefit Guaranty Corporation Claims (the "Motion") and the Objection of Peter A. Crawford ("Crawford") to that Motion. Both the Chapter 7 Trustee of Wolverine Proctor & Schwartz, LLC (the "Debtor") and the Pension Benefit Guaranty Corporation (the "PBGC") filed responses to Crawford's Objection, and the Court heard the matters on February 24, 2009. The issue presented is whether the Trustee's proposed settlement is fair and reasonable and is in the best interests of creditors in view of the obstacles, expense and delays associated with litigating the amount of the PBGC's claims.

### II. BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on April 1, 2006. Over 40 years before it filed its Chapter 7 petition, it had established the Proctor & Schwartz Salaried Employees Retirement Plan to provide retirement benefits to certain employees.

1

According to the Trustee, the Debtor was the administrator of the plan to which Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. applied (ERISA); that pursuant to 11 U.S.C. § 704(11) she was charged with performing the Debtor's obligations as administrator of the ERISA plan; that all benefits under the plan were frozen as of December 31, 1997; that as of January 1, 2005, only 67 employees of the Debtor were covered by the plan; and that as of the date of the filing of the petition, almost all of the Debtor's operations had ceased and all employees were terminated, with the exception of certain key employees who were retained briefly without benefits.

On December 9, 2008, the Trustee filed her Motion seeking approval of the Settlement Agreement regarding the PBGC's claims. In her Motion, the Trustee disclosed that, in January 2007, the PBGC advised her that the administrative process to terminate the plan was under way and that, shortly after receiving that advice, the PBGC issued a Notice of Determination under 29 U.S.C. § 1342(a) that the plan had not met the minimum funding standard required under § 412 of the Internal Revenue Code. The Trustee also disclosed that the PBGC informed her that the plan would be unable to pay benefits when due and that it must be terminated under 29 U.S.C. § 1342(c). The Trustee further revealed that, on or around March 26, 2007, she and the PBGC executed an Agreement for Appointment of Trustee and Termination of Plan pursuant to which the plan was terminated as of April 1, 2006, the PBGC was appointed trustee of the plan, and the Trustee agreed to deliver all records, assets or property of the plan to the PBGC.

Before the execution of the Plan Termination Agreement and the expiration of the

applicable bar date for filing proofs of claim, the PBGC filed three proofs of claim:

> Claim No. 70 pursuant to which the PBGC asserted a claim, contingent upon plan termination, estimated in the amount of $6,991,500 for unfunded benefit liability, including an unliquidated amount as a priority claim;
>
> Claim No. 71 pursuant to which the PBGC asserted a claim in the amount of $2,012.393 for minimum funding contributions, of which $1,340,217 was entitled to priority; and
>
> Claim No. 72 in which the PBGC asserted entitlement to an unliquidated priority amount for premiums on account of the plan.

In attachments to each of its proofs of claim, the PBGC stated that its investigation was continuing and that it reserved its right to "amend, modify and supplement this proof of claim and/or to file additional proofs of claim."

In her Motion to Approve Settlement, the Trustee recounted the exchange of information among herself, her accountants, and the PBGC, including data, calculations and actuarial analyses with respect to the claims, and she stated that she objected to the proofs of claim filed by the PBGC. According to the Trustee, she disputed the PBGC's assertions that portions of its claims were entitled to administrative expense or priority treatment, the method of calculating the claims, the lack of documentation supporting the claims, and the potential overlap and duplication of the claims.

Based upon her investigation of the claims, and various reports prepared by the PBGC, which she attached to her Motion (the "Actuarial Reports"), as well as the costs, delays and complexity of litigating her objections to the PBGC's claims in view of the myriad legal issues relating to claims under ERISA, including the appropriate discount rate and unsettled case law, the Trustee filed the Motion to Approve Settlement Agreement.

3

Pursuant to that Motion, she asked the Court to approve the allowance of PBGC's claims as follows:

> An Unpaid Minimum Funding Contribution Claim in the amount of $50,000 as an unsecured priority claim;
>
> An Unfunded Benefit Liabilities Claim (the "UBL Claim") in the amount of $8,399,500 as a general unsecured claim; and
>
> A Plan Premiums Claim in the sum of $101,084.25 as a general unsecured claim.

Crawford objected. He complained 1) that there was no indication that the PBGC provided the Trustee with more information than that which she attached to her Motion, namely the Actuarial Reports; 2) that, even though his review of the fee application of the Trustee's accountant, Verdolino & Lowey, revealed that considerable pension-related activities were on-going in 2007, "[t]here is no indication that this extensive review resulted in any changes to the PBGC's claims;" 3) that the UBL claim (set forth in the amount of $8,449,500 on the Unpaid Minimum Funding Contributions and Unfunded Benefits Report attached to the Trustee's Motion) was higher that the original estimate of $6,991,500 by $1,458,000; 4) that the PBGC had not filed amended proofs of claim; and 5) that "the 2004 annual report of Wolverine Proctor LLC, the ultimate parent of Wolverine, Proctor & Schwartz, Inc., the Debtor's predecessor, . . . indicates an unfunded liability of $5.885 million . . . calculated using a 6.5% discount rate," which is $2.564 million less than the PBGC's UBL claim calculated 15 months later. Crawford also complained that the actuarial assumption that the Debtor's work force was half male and half female was incorrect as the work force of the Debtor's predecessor was predominately male.

4

Based upon his observations, Crawford did not contest the Trustee's decision to settle the Unpaid Minimum Funding Contribution Claim or the Plan Premium Claim. Rather, he challenged settlement of the UBL claim, arguing that due process precludes the allowance of the PBGC's claims in excess of the amounts stated in their original claims, citing In re U.S.Airways Group, Inc., 303 B.R. 784, 787 n.2 (Bankr. E.D. Va. 2003). Additionally, he asked the Court to infer that the perceived lack of supporting information attached to the Trustee's Motion was indicative of the PBGC's successful effort to coerce the Trustee into settlement "by stonewalling, inducing settlement for an inflated amount by largely giving up its essentially frivolous assertions of administrative and tax priorities."

Crawford also juxtaposed a $482,500 contribution to the plan made by the Debtor's predecessor in 2005, reflected in the consolidated financial statements for the Debtor's predecessor,[1] with a $352,500 contribution set forth in the Pension Information Profile prepared by the PBGC. He did not disclose, however, that the $482,500 contribution was "expected" to be made, and he did not submit evidence that a contribution in that amount was actually made in 2005.

In addition to the issues raised above, Crawford maintained that the discount rate used to calculate the PBGC's claims should be higher and determined with reference to bankruptcy law principles. He also asserted that the UBL Claim was computed improperly, that the Actuarial Reports are opaque, and that the assumptions used in them

---

[1] Crawford attached a copy of three pages (pages 19-21) of the Consolidated Financial Statements of Wolverine Proctor LLC and Subsidiaries for the years ended December 31, 2004 and 2003 to his Objection.

5

are demonstrably wrong, again pointing to the greater number of male employees covered by the plan than female employees.[2]

Crawford also contested the $10,660,054 value ascribed to the plan assets in the Actuarial Reports. He maintained that the PBGC and the Trustee merely extrapolated the assets of the plan to April 1, 2006 based upon the assets in the plan 15 months earlier. He asserted that this was "contrary to the statute . . . and the likelihood that returns may have deviated substantially from those projected."

As noted above, both the Trustee and the PBGC responded to Crawford's objection and addressed the various factual issues he raised. The Trustee argued that the Settlement Agreement had to be viewed in its entirety with reference to the reduction of more than one million in priority claims originally asserted by the PBGC. Moreover, she maintained that there were no significant errors in the PBGC's reports, and Crawford's assertion that she was coerced into settlement was baseless. Additionally, she noted that "the gender ratio assumption of plan participants is reasonable inasmuch as increasing the gender ratio

---

[2] He stated:
The erroneous assumption as to the makeup, by sex, of the plan participants is a possible explanation of a significant portion of the $2.564 million gap between what the PBGC asserts is the unfunded liability and that stated in the 2004 financial statements of the debtor's predecessor. Some of the remainder may be due to the 5.6% discount rate used by the PBGC vs. the 6.5% used in the 2004 financial statements, which is estimated by Mr. Crawford to account for roughly $750,000. In addition, the set of "fudge factors" that appear in section C. of the "Estimated Value of Guaranteed Liabilities" spreadsheet account for approximately $1.8 million. The validity of these factors cannot be ascertained from the information provided.

6

to 80% male as Crawford argued, would actually increases the PBGC's UBL claim. The PBGC supported the Trustee's arguments.

## III. DISCUSSION

A. Standard for Approval of Compromises

In In re High Voltage Eng'g Corp., 397 B.R. 579 (Bankr. D. Mass. 2007), *aff'd,* __ B.R. __, 2008 WL 987502 (D. Mass. April 14, 2009), this Court set forth the standard for approval of settlements under Fed. R. Bankr. P. 9019, quoting In re Healthco Int'l, Inc., 136 F.3d 45 (1st Cir.1998). This Court stated:

> The bankruptcy court essentially is expected to "'assess [ ] and balance the value of the claim[s] ... being compromised against the value ... of the compromise proposal.'" Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir.1995) (citation omitted). It may consider, among other factors: (1) the probability of success were the claim to be litigated-given the legal and evidentiary obstacles and the expense, inconvenience and delay entailed in its litigation-measured against the more definitive, concrete and immediate benefits attending the proposed settlement, *see* Kowal v. [Malkemus (In re Thompson)], 965 F.2d [1136] at 1141 n. 5, 1145 [(1st Cir.1992)] (so-called "best interests" standard); (2) a reasonable accommodation of the creditors' views regarding the proposed settlement; and (3) the experience and competence of the fiduciary proposing the settlement. *See* Jeffrey, 70 F.3d at 185; In re Texaco, Inc., 84 B.R. 893, 902 (Bankr.S.D.N.Y.1988) (citing Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)).

> Id. at 50. *See also* In re Fibercore, Inc., 391 B.R. 647 (Bankr.D.Mass.2008). "When considering . . . [a settlement] . . ., deference should also be given to the Trustee's judgment regarding the settlement, Hill v. Burdick (In re Moorhead Corp.), 208 B.R. 87 (1st Cir.BAP1997), provided that the trustee can demonstrate that the proposed compromise falls within a 'range of reasonableness.'" Fibercore, Inc., 391 B.R. at 655 (citing In re Whispering Pines Estates, Inc., 370 B.R. 452, 461 (1st Cir.BAP2007), and In re 110 Beaver

> St. P'ship, 244 B.R. 185, 187 (Bankr.D.Mass.2000)).
>
> As the First Circuit stated in Healthco, the factors set forth by the court in Jeffrey v. Desmond, are not exclusive. 136 F.3d at 50. In In re Telcar Group, Inc., 363 B.R. 345 (Bankr.E.D.N.Y.2007), the court added public policy as a factor to consider, stating that it was "obliged to consider the public policy implications of the settlement, whether or not the issue is raised at all, much less by a non-party." Id. at 353.

High Voltage Eng'g Corp., 397 B.R. at 601-602.

Applying that standard to the Trustee's Motion to Approve Settlement compels the conclusion that the Trustee properly exercised her business judgment in reaching the settlement which is fair and reasonable. The Trustee evaluated the merits of the PBGC's various claims, achieved a sizable reduction in the amount of its priority claims, and avoided protracted and complex litigation with respect to the merits of the claims. Crawford admitted that the Trustee engaged her accountant to assist her in evaluating the claims. Moreover, "[t]he method used by the PBGC in determining the amount of unfunded benefit liabilities is complicated." Dugan v. PBGC (In re Rhodes, Inc.), 382 B.R. 550, 554 (Bankr. N.D. Ga. 2008). Litigating the amount of the PBGC claims would be a lengthy and costly undertaking as evidenced by the discussion of expert testimony by the court in In re U.S.Airways Group, Inc., 303 B.R. 784, 789-91 (Bankr. E.D. Va. 2003). Accordingly, the Trustee's business judgment in seeking settlement over protracted, complex, and costly litigation is entitled to deference. This is particularly so in view of the competing public policies under ERISA and the Bankruptcy Code, namely the protection of employee benefits and the fair and equitable treatment of creditors' claims, respectively.

While Crawford raises a number of worthwhile points and should be commended

8

for scrutinizing the reasonableness of the settlement, the Court finds that the Trustee and the PBGC ably addressed and rebutted the points made in his Objection, in particular his assertion that the gender allocation increased the amount of the ULB claim. With reference to Crawford's focus on the applicable discount rate, the Court concludes that, although two circuit court of appeals decisions, In re CF & I Fabricators of Utah, Inc., 150 F.3d 1293 (10th Cir.1998), *cert. denied,* 526 U.S. 1145 (1999), and In re CSC Indus., Inc., 232 F.3d 505 (6th Cir.2000), *cert. denied,* 534 U.S. 819 (2001), have rejected application of the PBGC regulation in favor of a so-called "prudent investor" discount rate, this Court, *see* In re High Voltage Eng'g Corp., No. 05-10787, Slip Op. at (Bankr. D. Mass. July 26, 2006), and others, *see* In re Kaiser Aluminum Corp., 339 B.R. 91, 96 (D. Del. 2006), Dugan v. PBGC (In re Rhodes, Inc.), 382 B.R. 550 (Bankr. N.D. Ga. 2008), In re U.S. Airways Group, Inc., 303 B.R. 784 (Bankr. E.D. Va. 2003), In re UAL Corp., No. 02 B 48191 (Bankr. N.D. Ill. Dec. 30, 2005), have determined that the Supreme Court's decision in Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15 (2000), requires the bankruptcy court to determine that a creditor's claim "'in the first instance' is a function of the nonbankruptcy law giving rise to the claim." U.S. Airways Group, Inc., 303 B.R. at 792. Thus, the Trustee decision to adopt the emerging line of cases was reasonable in the absence of decisions from the United States Court of Appeals for the First Circuit, especially where this Court previously has ruled on the issue.

Finally, Crawford's argument that the PBGC should be precluded from recovering more than what it set forth in its proofs of claim is readily resolved. In the first place, the PBGC filed amended claims on February 12, 2009. Secondly, in its original proofs of claim,

9

it stated that its investigation was continuing and that it reserved its right to "amend, modify and supplement this proof of claim and/or to file additional proofs of claim." Accordingly, due process does not preclude allowance of the Trustee's Motion to Approve Settlement Agreement.

Crawford's remaining arguments, particularly those in which he suggests that the Trustee was strong-armed into accepting a settlement with the PBGC are speculative and without evidentiary support. The Chapter 7 Trustee in this case is an experienced bankruptcy attorney known for competence and integrity. While this Court has considered Crawford's factual and legal arguments, it unequivocally rejects those that intimate that the Trustee has failed to perform her duties under 11 U.S.C. § 704 as wholly unmeritorious.

**IV. CONCLUSION**

In view of the foregoing, the Court finds that the Trustee satisfied her burden under In re Healthco Int'l, Inc. and Jeffrey v. Desmond. Accordingly, the Court shall enter an order granting the Trustee's Motion to Approve Settlement Agreement.

By the Court,

Joan N. Feeney
United States Bankruptcy Court

Dated: May 5, 2009
cc: Lynne F. Riley, Esq., Brad Rogers, Esq., Peter A. Crawford